IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SCANVINSKI HYMES,                          No. C 03-2150 SI

       Plaintiff,
v.                                         **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

J. McGRATH, et al.,

       Defendants.
_____/

This matter came on for court trial, the parties having waived a jury, in November 2004. Live testimony was taken and exhibits, including videotape of various incidents at Pelican Bay, were received on November 9, 10, 15, 16, 17, 18 and 22, 2004. In addition, deposition testimony was submitted to the Court for review after trial proceedings were completed. Having considered the evidence received and having evaluated the credibility and demeanor of the witnesses while testifying, the Court hereby makes the following findings of fact and conclusions of law.

**PRELIMINARY STATEMENT**

By way of introduction, the Court observes that throughout this action, plaintiff's core contention has been that while he was an inmate at Pelican Bay State Prison "he was forcibly medicated with psychotropic drugs as a result of a conspiracy among the defendants on two separate occasions. This conspiracy was created and implemented out of defendants' frustration in dealing with plaintiff's oppositional stance towards custody." Plaintiff's Proposed Statement of Facts and Conclusions of Law ("Pl's Findings"), at 1. Having heard all the witnesses in this action, including plaintiff's extensive testimony and the testimony of numerous treating physicians, psychiatric workers, medical personnel and other correctional officials, the Court does not

find that there was a conspiracy as alleged. It is true that plaintiff took an "oppositional stance towards custody" – he testified to as much, and the evidence of this attitude was extensive. It is also true, as various witnesses stated and as the Court observed, that plaintiff is a bright, articulate and engaging man who can be charming when he wishes to be. But there was substantial testimony that plaintiff could be, and often was, explosive, violent, physically dangerous to others and extremely disruptive in the close confines of a prison setting.

Plaintiff explained that most of his behavior was intended to demonstrate that he had no respect for people in uniform. He recalls informing "custody" – the custodial staff – that "we were at war," and that any time they tried to open his cell door, there would be problems. He did not deny that he violated Pelican Bay rules over 100 times, but stated that it was always volitional. He chose to act out because he felt that the CDC had abused him, not just in Pelican Bay but for many years; he has a long memory and sometimes retaliated years later. He had previously been sent to Atascadero for treatment after having been found incompetent to stand trial. While there, he sustained at least one felony conviction for assaultive behavior, which he explained by saying he "did what he had to do" (stabbed an RN with a sharpened toothbrush) when a cell extraction was being performed. He testified that after he acts out, he feels better – he has done what he has to do and has made his point. He testified that he feels that he is always in control of himself, even though it might look like he is not. He emphasized that he did not want a "psych jacket" – did not want to be in the CDC mental health system – because "the only thing I have left is my mind." He did not want to lose his own identity and control. At the same time, he sometimes stipulated to being "NGI" – not guilty by reason of insanity or incompetent to stand trial, because it would cause "delay."

Captain Daniel Smith, one of the defendants in the case, testified that plaintiff is personable when he is rational: he is bright and has a good sense of humor; but he views acting out as his job. Dr. Ronald Bortman, another defendant, testified that he thought that without treatment, plaintiff was heading for a destiny of life in prison, most of it to be spent in the SHU; he thought this was "tragic," since he felt plaintiff had a treatable mental illness.

It was in this context that medical and psychiatric personnel at Pelican Bay made efforts to treat plaintiff. Not all of the treaters agreed on the correct diagnosis for plaintiff, but all recognized substantial and dangerous

mental conditions. Ultimately, the treatment team devised a treatment "plan" for Mr. Hymes. What they characterized as a treatment plan plaintiff characterizes as a conspiracy. Having heard the evidence, the Court finds that the treatment plan was just that – a plan developed in good faith to treat a puzzling, contradictory and unpredictable situation. That there were medical disagreements among the treaters reflects the difficulty of the problem presented, not a conspiracy to administer involuntary medication.

## **FINDINGS OF FACT**

**A.  Background: plaintiff and defendants**

1. Plaintiff is an African American male who was born on February 15, 1970. He spent much of his childhood in foster care, had his first contact with the criminal justice system at age 9, and was first incarcerated at age 14. Since then he has been in prison intermittently, in large part because of offenses committed as a prisoner against custody.

2. The actions at issue in this case occurred while plaintiff was an inmate at Pelican Bay State Prison, between 1995 and 2001. Defendants in this action are Dr. Ronald Bortman, a psychiatrist at Pelican Bay State Prison; Teresa Schwartz, who was Associate Warden for the general population at Pelican Bay during most of the time relevant to this case and, at time of trial, was Warden of the California Medical Facility at Vacaville; and Captain Daniel Smith, who was Facility Captain in charge of the Security Housing Unit (SHU) during much of the time relevant here and was, at the time of trial, Associate Warden in charge of business services at Pelican Bay.

3. During this time at Pelican Bay State Prison, plaintiff was regularly housed in the institution's Security Housing Unit (SHU). He was a serious disciplinary problem: between January 6, 1998 and May 20, 2001, he had over a hundred charged disciplinary incidents, including batteries on peace officers, willfully resisting, delaying, obstructing peace officers, threat of force or violence, Destruction/Damage/Misuse of State Property, and indecent exposures. Plaintiff's assaults on correctional staff led to injury to, and early retirement of, several correctional officers.

4. Plaintiff had been actively litigious, having filed between six and eight federal lawsuits so far. In 1996 he filed three civil rights actions in federal court against various custody officers at Pelican Bay and

received a $60,000 settlement on one of them. He had filed dozens of internal inmate appeals (form 602s) and was, in his own estimation, a "very high profile inmate."

5. Prior to 1995, plaintiff had been seen and evaluated by many mental health professionals, none of whom to that point had determined that he suffered from a mental illness that was properly treated with psychotropic medication. Between 1995 and April, 1999, plaintiff was seen or evaluated by numerous mental health professionals at Pelican Bay. There was no consensus on a diagnosis. Plaintiff testified that although he had not been suicidal since 1992, he occasionally pretended to be suicidal, for manipulative purposes and because it "made him laugh." At one point he pretended to take an overdose of medications, and several times he hid razor blades and pretended to have swallowed them. He also testified that he sometimes has manipulated staff with false claims of chest pain.

**B. Mental health facilities/regulations at Pelican Bay State Prison**

6. The Psychiatric Services Unit (PSU) at Pelican Bay was created as a result of the case of Madrid v. Gomez, No. C 90-3094 THE (N.D. Cal.), for the purpose of dealing with Pelican Bay inmates who normally would be housed in the Security Housing Unit (SHU) but who, because they have certain mental health conditions, are at a particularly high risk of serious injury to mental health by virtue of such housing. Such inmates must be removed from the SHU, and the PSU provides the alternative housing. The Madrid remedial order specifically identifies those at risk individuals as including either inmates with an Axis I diagnosis, or the following:

(1) inmates with a mental disorder that includes being actively suicidal;
(2) inmates diagnosed with a serious mental illness characterized by breaks with reality or perceptions of reality that lead the inmate to significant functional impairment;
(3) inmates diagnosed with an organic brain syndrome that results in significant functional impairment if not treated;
(4) inmates diagnosed with a severe personality disorder manifested by episodes of psychosis or depression, and results in significant functional impairment; or
(5) inmates with mental retardation with significant functional impairment.

7. The goal of the PSU is to provide evaluation and treatment of mental health conditions that are limiting the ability of inmates with high security needs to adjust to appropriate institutional placements. Program objectives of the PSU include: (1) providing comprehensive mental health assessment of inmates to determine the need for treatment and appropriate clinical placement; (2) providing alternative housing for inmates whose

mental health needs limit their ability to adjust to the SHU; (3) providing clinical interventions to reduce the inmate's level of dangerousness and allowing re-integration into less restrictive clinical and custodial environments; and (4) assisting inmates in acquiring skills to function more safely and successfully in an appropriate institutional placement.

8. Pelican Bay PSU policy provides that inmates housed in the SHU may be referred by any staff member for an assessment of mental health needs. The normal time for clinical assessment for those referred to the PSU is 14 days, but that this period may be extended with the approval of the applicable Interdisciplinary Treatment Team (IDTT).

9. Every inmate treated by the Mental Health Department -- including plaintiff -- has a Treatment Plan which is periodically discussed and reviewed by an Interdisciplinary Treatment Team (IDTT). The purpose of a Treatment Plan for mental health inmates is to facilitate the goals and objectives of the Psychiatric Services Unit. In particularly difficult cases the Chief Psychiatrist may be involved in Treatment Plan discussions. Custodial staff familiar with the inmate are also involved in the discussions, since they can provide information regarding the inmate's behavior and conduct.

10. State prisoners cannot be involuntarily medicated unless Keyhea provisions are followed so named based on an injunction issued in Keyhea v. Rushen, 178 Cal.App.3d 526 (1986). Pursuant to the Keyhea injunction, prison officials may not administer involuntary medication to state prison inmates in excess of three days unless certain conditions for certification of additional treatment are met. Pursuant to the Keyhea injunction, a certification hearing must be held within ten days of the initial involuntary medication.

11. The Keyhea injunction does not prohibit emergency administration of antipsychotic medication. An emergency exists when there is a sudden marked change in the prisoner's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the patient or to others, and it is impracticable to first obtain consent. If the medication is administered during an emergency, such medication shall be only that which is required to treat the emergency condition and shall be provided in ways that are least restrictive of the personal liberty of the patient.

**C. Plaintiff's treatment plan**

5

12.     Dr. Bortman began working at Pelican Bay in March 1999. In July, 1999, Dr. Bortman recommended to the plaintiff's IDTT that plaintiff be referred to the PSU for a psychiatric evaluation. Plaintiff contends that this referral was the first step in the conspiracy to medicate him involuntarily. However, Dr. Bortman testified, credibly in the Court's view, that this referral was based on his diagnosis that plaintiff has a mental illness, perhaps bi-polar disorder, and his medical opinion that plaintiff might benefit from a more thorough evaluation and possible treatment at the PSU. By the time of this referral, Dr. Bortman had reviewed much of plaintiff's voluminous medical file, had spoken with Associate Warden Teresa Schwartz and other custodial officials about plaintiff and had conducted a brief interview with plaintiff. It was his "sense" that there was disagreement among the various medical and other personnel as to what the correct diagnosis should be, but he felt there clearly was a mental health disorder. Plaintiff was transferred to the PSU in July, 1999 and stayed through September. He was evaluated there, including an extensive psychological evaluation by Tod A. Roy, Ph.D., a clinical psychologist. Dr. Roy's 9/1/99 report (Ex. #22) concluded that plaintiff is behaviorally disordered, was demonstrating progressive development of a psychopathic personality, with a "personality organization which uses aggression to express [] identity and satisfy needs [] with a callousness that is completely self-serving." Dr. Roy opined that "Hymes cannot respond to traditional treatment . . . because he will not respond and cannot in effect change his behavior." He concluded that "it would be a disservice to the PSU to have this inmate remain in the unit due to his severe character pathology," as he "is not treatment amenable." Plaintiff was thereafter released back to the SHU.

13.     Dr. Everett Allen was first hired by PBSP as a contract physician/surgeon in March of 1999 (he characterized this as a "doc-in-the-box" position). In February, 2000 he was hired by PBSP as a staff physician/surgeon; on July 7, 2000, he was promoted to the position of Chief Physician and Surgeon. He had substantial contacts with other medical professionals as well as custody staff. Dr. Allen was the primary medical doctor at the SHU infirmary during much of the time relevant to this action, and dealt with plaintiff often. Plaintiff made many complaints to medical staff regarding chest pains, and Dr. Allen became involved in plaintiff's treatment to try to provide an objective medical diagnosis of plaintiff's coronary health, as well as to attempt to minimize some of the disruptive contact plaintiff had with custody and staff.

6

### D. The Keyhea procedures: 4/27/00 and 4/10/01

14. The central events of plaintiff's conspiracy allegations are two instances of involuntary medication using Keyhea procedures. Both were initiated by Dr. Bortman.

15. On July 27, 2000, plaintiff lay down and refused to cooperate with custody officers who were moving him from one cell to another. He told them "It's on," meaning he would fight the custody officers. When officers attempted to lift him off the ground he violently kicked, attempting to get free, and yelled threats. He testified that he was in control of himself the whole time, although it might have looked like he was out of control to observers. Much of this incident was captured on videotape, which was admitted in evidence (Ex. 63) Three officers were assaulted, two of whom were taken to the hospital for treatment.

16. The Admission Summary and Notice of Certification relating to plaintiff's first certification for involuntary medication (the first Keyhea) was prepared by Dr. Bortman on July 27, 2000 (Ex. 65, 215). This was based on plaintiff's assaultive behavior and the injury to three officers. On that date, Dr. Bortman medicated plaintiff with Haldol and other medications, on an emergency basis. Dr. Bortman testified credibly at trial that he wanted plaintiff to get appropriate psychiatric and medical treatment for his condition, which he then believed might be bipolar disorder with rapid cycling, and he felt Depakote would be appropriate treatment. He was aware that nurse Cyndi Scott disagreed with his decision to place plaintiff in restraints, but felt her behavior was inappropriate. On July 28, 2000, John Douglas, M.D., took over for Dr. Bortman, who was on vacation. At that point, plaintiff agreed to voluntarily take Depakote and the Keyhea process was terminated. Dr. Douglas believed plaintiff's Axis I diagnosis should be "intermittent explosive disorder," rather than bipolar disorder, but he did not have any reason to question Dr. Borton's good faith belief in his bipolar diagnosis. Dr. Allen also saw plaintiff at this time, and worked with Dr. Douglas to persuade plaintiff to take the Depakote. Dr. Allen thought it possible that plaintiff had a seizure disorder.

17. On July 28, 2000, SHU clinician Delbert Costiloe, LCSW, signed a document which contained his Axis I diagnosis of plaintiff (R/O Mood Disorder NOS, versus Cognitive Disorder NOS). (Ex. 223) Mr. Costiloe believed that plaintiff needed treatment based on his assaultive, disruptive behavior

18. Plaintiff took the Depakote for approximately six weeks (July 28, 2000 - September 12, 2000), during which time his behavior improved significantly. He testified at trial that he agreed to take the

7

1 Depakote to show them that it would not control him, but he acknowledged that while he was taking it he was
2 letting things slide that ordinarily he wouldn't give the officers the benefit of. On September 12, 2000, plaintiff
3 refused to continue taking the Depakote, because he did not want to "get a psych jacket." Dr. Allen advised
4 him to keep taking the medication.

5      19. In February, 2001, plaintiff began having incidents in the SHU again. He testified that he
6 wanted to "irk" the staff, so he began kicking his cell, doing considerable damage. He placed razor blades in
7 his mouth, and when officers tried to get them back he kicked them and thrashed violently while being subdued.
8 Also in February 2001, plaintiff decided to plead NGI to a case pending against him in Del Norte County.
9 Sometime before April, 2001 Dr. Bortman was subpoenaed to testify about plaintiff at the NGI hearing.

10      20. On April 10, 2001, plaintiff destroyed a telephone after an attorney visit. Later that day, he
11 assaulted Correctional Sergeant Anthony VanNocker while being transported to a holding cell. Thereafter,
12 plaintiff was taken to the infirmary and evaluated. The second Notice of Certification for involuntary medication
13 (second Keyhea) was signed by staff psychologist Robert Levine, Ph.D., on April 10, 2001, as the evaluating
14 physician, and was signed by Dr. Bortman, as the chief psychiatrist or his designee (Ex. 220; see also 99, 100,
15 and 221). On the Notice, Dr. Levine and/or Dr. Bortman checked the box that plaintiff Hymes was a danger
16 to others. The Notice states: "Plaintiff repeatedly assaulted staff resulting in injury to staff . . . unable to control
17 assaultive behavior. He is mentally ill and refusing voluntary medication." Plaintiff was involuntarily medicated
18 with Depakote, Haldol and other medications.

19      21. Dr. Wendy Saville, Chief Psychiatrist at PBSP, performed an independent psychiatric evaluation
20 of plaintiff on April 12, 2001, at the request of her supervisor (CMO Dr. Winslow). She determined that Dr.
21 Bortman's Keyhea in April of 2001 was warranted and proper, although she reached a different Axis I
22 diagnosis of plaintiff. (Ex. 104, 222) On April 17, 2001, plaintiff was discharged to the PSU by Dr. Bortman,
23 for evaluation by the Treatment Team. (Ex. 106) Dr. Roy evaluated him, and on May 8, 2001 issued a report
24 finding that although plaintiff had an Axis II "antisocial personality disorder, severe, psychopathic variant," he
25 had no Axis I disorder meeting SHU exclusion criteria. (Ex. 111) Thereafter, plaintiff was returned to the SHU,
26 where he continued his "oppositional conduct" toward custody.

### E. Staff evaluations of plaintiff

22. All of the trained professionals who performed formal evaluations of plaintiff over the years agreed that he suffers from some psychiatric diagnosis, or mental illness. However, they differed in their identification of the diagnosis, ranging from bipolar disorder (Dr. Bortman), to Provisional-Mood Disorder NOS (Dr. Saville and D. Costiloe, LCSW), to personality disorder (all psychiatrists and psychologists), and to explosive disorder (Dr. Douglas). There was substantial disagreement among mental health specialists concerning the psychological/psychiatric Axis I diagnosis, but far less disagreement concerning the Axis II diagnosis of plaintiff Hymes. Except Dr. Roy, all agreed that Depakote was an appropriate medication for plaintiff.

23. All of the psychologists and psychiatrists who testified in this action (Dr. Bortman, Dr. Saville, Dr. Roy and Dr. Douglas) confirmed that such disagreements in diagnosis are common at Pelican Bay State Prison. Further, each of the mental health specialists who testified (Dr. Douglas, Dr. Saville and Dr. Roy) stated that he or she had no reason to doubt that Dr. Bortman's diagnosis of plaintiff was made in good faith. Dr. Bortman testified credibly that he believed, and believes, his diagnosis was correct.

24. None of the mental health specialists who testified had any reason to believe that Dr. Bortman's diagnosis of plaintiff, or his initiations of the Keyhea procedure in July of 2000 or April of 2001, were a part of any plan or scheme or conspiracy with custody to have plaintiff removed from the SHU.

25. Defendant Smith, a facility captain of the SHU, requested that a psych evaluation be performed on plaintiff based on Smith's good-faith concerns arising from plaintiff's behavior and prior claims of mental illness. Defendant Smith understood that there was a plan to have plaintiff referred to PSU for an evaluation based on plaintiff's unpredictable, disruptive, explosive behavior. Defendant Smith understood this was a legitimate treatment plan put forward by the IDTT. Defendants Smith and Schwartz never conspired to have plaintiff undergo a Keyhea. Defendants Smith and Schwartz never conspired to recommend referral to PSU without reason. Dr. Allen's contrary opinion was based on incomplete information.

26. Dr. Bortman's decisions to initiate treatment of plaintiff with psychotropic medications on July 27, 2000 and April 10, 2001 were based his genuine medical judgment that such treatment was appropriate under the circumstances.

9

27. The Court found the defendants' testimony in this case to be credible. The differing diagnoses of plaintiff's condition reflected the complicated nature of the condition, not a conspiracy against him. The Court found no evidence of deliberately incorrect medical opinions concerning plaintiff's condition.

## CONCLUSIONS OF LAW

1. Plaintiff has not proved, by a preponderance of the evidence, that defendant Bortman, defendant Smith or defendant Schwartz deliberately violated any of the procedural requirements or substantive standards of the Keyhea provisions or the Madrid protocol, in connection with any recommendations for plaintiff's referral to the PSU or on those two occasions where plaintiff was involuntarily medicated.

2. Under 42 U.S.C. § 1985, plaintiff was required to prove, by a preponderance of the evidence, that (1) there was a conspiracy whose purpose was to deprive the plaintiff of equal protection or equal privileges and immunities, or to obstruct the course of justice in the state; (2) that the defendants intended to discriminate against the plaintiff; (3) that the defendants acted under color of state law and authority; and (4) that the acts done in furtherance of the conspiracy resulted in an injury to the plaintiff's person or property or prevented him from exercising a right or privilege of a United States citizen. Griffin v. Breckenridge, 403 U.S. 88 (1971); Skolnick v. Campbell, 398 F.2d 23 (7th Cir. 1968); Hoffman v. Halden, 268 F.2d 280 (9th Cir. 1959). Plaintiff has not done so, because plaintiff did not prove any agreement, or meeting of minds, between among the parties, to violate the plaintiff's constitutional rights.

3. Plaintiff did not prove by a preponderance of the evidence that any treatment provided by Dr. Bortman to plaintiff violated plaintiff's constitutional or statutory rights. Dr. Bortman did not act with deliberate indifference to plaintiff's serious medical needs, Estelle v. Gamble, 429 U.S. 97, 106 (1976), nor did that treatment amount to cruel and unusual punishment in violation of 42 U.S.C. § 1983 or California Civil Code § 52.1. The difference of opinion between Dr. Bortman and plaintiff concerning the appropriate course of treatment for plaintiff does not amount to deliberate indifference, Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.1996); nor does the difference of opinion between Dr. Bortman and other medical professionals concerning the appropriate course of treatment for plaintiff. Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.1989).

4. Plaintiff did not prove by a preponderance of the evidence that any action on the part of

defendants Smith or Schwartz violated plaintiff's federal constitutional or California statutory rights.

5.   Plaintiff has not proved, by a preponderance of the evidence, that defendant Bortman, defendant Smith or defendant Schwartz acted maliciously and sadistically for the very purpose of causing harm to plaintiff, or conspired to do so.

6.   Plaintiff did not sustain any injury or damage or harm as a result of any improper act or omission on the part of any defendant.

**IT IS SO ORDERED.**

Dated: September 26, 2005

_____
SUSAN ILLSTON
United States District Judge

11